IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

DR. NOEL J. VARGAS-PÉREZ                                    Case No.

    Plaintiff

v.

HON. DENNIS RICHARD MCDONOUGH,
SECRETARY OF
U.S. VETERAN'S ADMINISTRATION;                              Re: Constitutional Torts

    Defendants

---

**COMPLAINT**
**REQUEST FOR INJUNCTION**
**and DECLARATORY JUDGMENT**

TO THE HONORABLE COURT:

NOW COMES DR. NOEL J. VARGAS-PÉREZ, through the undersigned legal representation and most respectfully Sets Forth and Prays:

### I. NATURE OF THE ACTION AND JURISDICTION

1. This action is brought pursuant to the First and Fifth Amendments of the Constitution of the United States.

2. This court has federal question jurisdiction to entertain this action pursuant to 28 U.S.C. §§ 1331.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b)(2).

4. Vargas-Pérez requests that all causes of action be tried before a jury.

### II. THE PARTIES

5. Vargas-Pérez is of legal age, a citizen of the United States and a resident of Puerto Rico.

6. Vargas-Perez is a doctor in medicine and, at all times relevant, he was employed as a permanent part-time neurologist at the Sleep Medicine Clinic of the Veteran's Administration Hospital in San Juan, Puerto Rico.

7. The defendant, U.S. Veteran's Administration, hereinafter "V.A." was at all times relevant, plaintiff's employer.

### III. RELEVANT FACTS[1]

8. Vargas-Pérez graduated in 2015 from the University of Puerto Rico School of Medicine and culminated his fellowship program in 2016 at Vanderbilt University. He is a neurologist who specializes in sleep medicine. Dr. Vargas-Perez also holds an *Ad Honorum* appointment in the University of Puerto Rico School of Medicine – Neurology Residency Program since August 18, 2018. In such capacity, Dr. Vargas-Perez has been responsible for educational supervision of neurology residents in physiology/sleep medicine matters.

9.` In September 2016, Perez-Vargas began to work at the Veteran's Administration Caribbean Healthcare System.

10. Vargas-Perez was hired by the V.A. as a *permanent part-time physician* pursuant to 38 U.S.C. § 7401(1)

11. At all times relevant to this Complaint, Plaintiff was responsible for a weekly sixteen (16) hours of duty on Thursdays and Fridays.

12. In 2019, Vargas-Perez participated in the creation and development of the Sleep Medicine Training Program at the V.A. along with other members of the medical staff. In 2020, Vargas-Perez began to work as one of the four attending physicians of the Sleep Medicine Training Program at

---

[1] The facts alleged in this Complaint are presented as representative of some but not all of the instances and incidents encountered by the Plaintiff at his workplace.

the V.A. working directly with the sleep fellows. Vargas-Perez had prior experience supervising neurology residents and pulmonary/critical care fellows since 2016. From 2020 to 2021, Vargas-Perez dedicated most of his time to supervise fellows at the Sleep Medicine Clinic.

13. The educational component provided by the opportunity to work in the creation of a Sleep Medicine Fellowship and to participate in the education of the sleep medicine trainees or fellows was at all times plaintiff's utmost interest and priority for accepting employment as a neurologist at the V.A.

14. For more than four (4) years, plaintiff's performance evaluations were outstanding.

15. For more than four years (4), plaintiff did not encounter any conflicts with peers or members of management at the V.A., the University of Puerto Rico's Neurology Residency Program or in his private practice. The same cannot be said about Dr. Lissette Jimenez, Chief of Neurology, Chief of Sleep Medicine, Sleep Lab Director, Program Director of the Sleep Medicine Clinic and Vargas' direct supervisor

16. Upon information and belief, Dr. Jimenez has encountered conflicts with multiple V.A. attending physicians, sleep medicine fellows, respiratory technicians, members of the program support group, among others, reason for which she has been the subject of multiple grievances with the AFGE.

17. In 2021, plaintiff began to denounce matters of public concern and then, his work environment turned hostile and aggressive.

18. In 2021, for the clinics held on May 20 and 27, Vargas-Perez began to experience excessive work overload due, in part, to overbooking of patients with appointments scheduled for the same day and hour. On these dates, the services of the sleep medicine fellows or trainees were not available due to various circumstances.

19. Plaintiff denounced the situation to defendant Dr. Jimenez as he understood that the overlapping and excessive scheduling of patients was due to a planification system that required prompt revision and improvement.

20. Vargas-Perez was ultimately concerned that the overlapping and overbooking placed patients at the receiving end of unnecessary risks of poor quality medical treatment and care and also placed the medical staff at the core of these threatening circumstances.

21. Given that Dr. Jimenez failed to address Vargas's expressed concerns, he submitted the issue to the American Federation of Government Employees (AFGE), and on June 1, 2021 notified Dr. Jimenez a request of formal meeting to discuss and clarify several issues related to workload and lack of staff affecting the working conditions.

22. The meeting was held on June 11, 2021. It was characterized by a hostile interchange between Dr. Vargas-Perez and Dr. Jimenez during which Dr. Vargas was forced to interrupt Dr. Jimenez every time she made expressions that were not true. Dr. Jimenez repeatedly asked Vargas-Perez in a hostile manner to stay quiet, "not to interrupt her" when he attempted to clarify statements and accusations she was presenting as true facts which were not.

23. During the above-mentioned meeting, Vargas expressed that his main interest in working for the V.A. was to participate in the training of physicians in the Sleep Fellowship Clinic and that it was part of Dr. Jimenez's plan when she offered him the employment at the V.A.

24. Dr. Jimenez responded to Vargas that the above-mentioned statement was not true. Because he was called a liar by Dr. Jimenez, Vargas responded that "maybe she did not remember" that "maybe she did not memorialize it in a green book" used regularly by her to make notations.

25. Vargas also reminded Dr. Jimenez that when she was to begin working at the V.A. she approached Vargas and invited him to work with her at the sleep laboratory she owned and

4

managed at Domenech Avenue in Hato Rey. When Vargas told her that he could not accept her invitation to work with her at her sleep laboratory because he was considering working with another sleep physician, she responded "well, let's see if they (V.A.) chose you." Once again, Dr. Jimenez stated: "What you (Vargas-Perez) are saying is no true." Thus, she tacitly called Vargas a liar.

26. The meeting of June 11, 2024 set the tone of the hostile communication that followed with Dr. Jimenez until his dismissal. Despite the fact that the purpose of the meeting was to discuss a matter of public interest that had repercussions on the quality of medical care of veterans, Dr. Jimenez dodged the issue, failed to address the matter and geared the discussion towards personal attacks and accusations against Vargas-Perez.

27. Dr. Jimenez responded to Vargas-Perez's denouncement of being subjected to a hostile work environment by presenting herself claims that it was Dr. Vargas who was creating a hostile work environment for her. She even presented allegations of discrimination by Vargas-Perez against her based on her gender, age, among others.

28. Dr. Jimenez's allegations of discrimination were presumptively investigated by her supervisor, Dr. Doris Toro, who engaged in several interviews and collected documents. However, Dr. Vargas was not interviewed nor his input requested.

29. During the summer of 2021, two of the fellows assigned to work at the Sleep Clinic were graduating and two new fellows were supposed to be recruited with a start date of July 1, 2021.

30. Vargas-Perez began working directly with the fellows throughout the whole month of August 2021.

31. The number of patients assigned to the new two fellows was excessive considering their limited level of previous training as well as the limited time allowed for teaching/case discussion.

32. The excessive number of patients assigned to the fellows and additional responsibilities attached to their position caused the fellows to work excessive hours, leaving the hospital between 6:00 to passed 8:00 p.m. This situation exacerbated Vargas-Perez's concern for the safety of veterans inasmuch as the quality of medical treatment and case was at risk because of the work overload and fellows' exhaustion.

33. Vargas-Perez, once again, raised his concern and denounced the situation with Dr. Jimenez seeking her assistance in managing the clinic in accordance with the level of training had by the fellows.

34. Instead of providing the necessary guidance, assistance and modification of the assignment process, Dr. Jimenez, again, rebuked her responsibility as Chief of the Clinic over the matter and pointed towards Vargas-Perez making him responsible to change the clinical profile at the clinic. That is, Dr. Jimenez delegated upon Vargas-Perez, a neurologist, the responsibility carried out by a clerk, of entering computer electronic system to change and open the spaces available for medical appointments.

35. Not only was the newly appointed duty not part or akin to the duties and responsibilities of a neurologist in general and Vargas-Perez in particular, but it required a level of clerical training not had by or provided to Vargas-Perez. Additionally, any time devoted to this training collided and conflicted with the already limited time Vargas-Perez had at his disposal to attend to the clinical work and medical matters required by the patients and fellows at the sleep clinic.

36. A meeting was held on September 2, 2021 and Vargas-Perez once again brought to the discussion his concern about the burnout experienced by the fellows, that the number of patients had become unmanageable and the possible detrimental consequences to the quality of medical care. Dr. Jimenez left the meeting abruptly.

37. Dr. Jimenez retaliated against Vargas-Perez for his continued denouncement of matters of public interest. The same day, Dr. Jimenez notified Vargas-Perez that she had removed him from the Sleep Medicine Fellow (SMF) clinic, Dr. Jimenez forbid Vargas-Perez to supervise the sleep fellows and assigned him to "run the clinic alone" seeing most patients, despite the fact that he was supposed to run the clinic with the assistance of the fellows (3 physicians for the clinic).

38. On September 2, 2021, in a retaliatory action and without any prior notice, Dr. Jimenz sent an email to Vargas-Perez, approximately forty (40) minutes before he was scheduled to begin his work at the Clinic, informing that she was removing him -for that day- from the duties associated with his supervision of the fellows assigned to the clinic. According to Dr. Jimenez, her decision was the product of her interest to alleviate "his burn out." However, Dr. Jimenez instructed him to provide direct medical services to almost all of the patients scheduled for medical services that same day.

39. Dr. Jimenez further retaliated against Vargas-Perez by excluding him from performing interpretations of polysomnography studies with the sleep fellows thereafter, but assigned him responsibilities that may be considered menial given the extent of his knowledge and expertise such, as performing "e-consults", and pressing him a high volume to be performed in one day. From this date until his dismissal, Vargas-Perez was forbidden from engaging in the interpretation of polysomnographs, a key and central component of his neurology sleep medicine practice.

40. Dr. Jimenez's retaliation became more evident with her appraisal of Vargas-Perez's professional performance.

41. The Proficiency Report of 2017, Vargas-Perez's performance was ranked as "Outstanding." He was recognized as "…an excellent human being," "…an outstanding physician with whom I am extremely happy to work with."

42. The Proficiency Report of 2018, Vargas-Perez's performance was once again recognized as "Outstanding." Dr. Jimenez herself acknowledged that Dr. Vargas "does not shy from addressing situations that affect quality of care."

43. The Proficiency Report of 2019, Vargas-Perez's performance was again, rated as "Outstanding." The same rating was granted for his educational competence (effectiveness in teaching, monitoring and coordinating educational activities, planning, evaluating and documenting), clinical competence (examination, diagnosis, therapeuticability, effectiveness in emergencies, patient management, consultations, specialty skills and record keeping), and personal qualities (emotional stability, effectiveness in planning, program planning, administrative judgment, decision willingness and reporting). Dr. Jimenez expressly recognized that Vargas-Perez is "an excellent physician with a great potential for growth and development. He is an excellent teacher … committed to quality. He is cooperative and responsible and relates well to patients and co-workers."

44. Dr. Jimenez's appraisal of Dr. Vargas-Perez performance began to be devalued after he made expressions regarding matters of public interest as the quality of care to veterans with overbooked, overworked and understaff sleep medical clinic and the hostile meetings they held on June 11, 2021 and September 2, 2021 [see supra]. The Proficiency Report of 2021, extends from October 1, 2020 to September 2021; that is, the period of time when Vargas-Perez first addressed the stated issue with Dr. Jimenez. Although Dr. Jimenez recognized that Dr. Vargas holds "high work standards," "he is responsible and a team player,' "he is committed to quality," "He is cooperative and responsible," "He relates well to patients and co-workers," she devalued Vargas-Perez's performance evaluation in the areas of "educational competence" (from "outstanding" to "high satisfactory,") and "personal qualities" (from "outstanding" to a mere "satisfactory").

8

45. On October 26 2021, Vargas-Perez filed a grievance with the AFGE charging Dr. Jimenez with creating a hostile work environment, the removal of his responsibilities at the V.A., retaliation for seeking union representation after they met in June 11, 2021 to discuss "workload distribution, overlapping appointments, and execution directions."

46. On November 10, 2021, Dr. Jimenez submitted her response to Vargas-Perez's grievance before the AFGE.

47. On November 23, 2021, that is, within three weeks of the grievance referred to in paragraph 45, Vargas-Perez was informed that Dr. Jimenez had presented a claim against him charging him with creating a hostile work environment against her.

48. As a result of Dr. Jimenez's charges, her direct supervisors – Dr. Doris Toro and Dr. Orlando Rodriguez-Vila – informed Vargas-Perez about their intention to impose disciplinary measures against him in the form of a reprimand that would be included in plaintiff's employment record.

49. On December, 2, 2021, a Weingarten meeting was held where Dr. Orlando Rodriguez-Vila interviewed Vargas-Perez regarding Dr. Jimenez's charges against him.

50. On December 13, 2021, the defendant notified Vargas-Perez about its decision to impose a reprimand and required his attendance to a meeting scheduled for December 23, 2021 to inform him about the reprimand.

51. On January 18, 2023, Vargas-Perez appealed the reprimand issued on December 29, 2022 and filed another grievance. which resulted in the rescission of the reprimand.

52. On January 25, 2022, the defendant rescinded the reprimand action.

53. The AFGE requested the Defendant to start an objective formal fact-finding investigation to be conducted by "other parties not related to medicine service and Chief-of-Staff Office" to prevent a conflict of interest and bias.

55. In response, the defendant appointed Mary Cervera, employed by the Defendant as "Chief Social Worker to Neurology, Sleep Lab Personnel", to conduct the investigation.

56. On March 11, 2022, Mary Cervera notified her "Inquiry Report."

57. According to the Inquiry Report, Cervera interviewed nine (9) individuals, including Dr. Jimenez and Vargas-Perez.

58. Cervera reflected in the document that multiple instance the Report mentioned that the employees interviewed were "being afraid of retaliation." One of the physicians interviewed expressly stated that "he underst[ood] that the style and tools used by Dr. Jimenez could be interpreted as harassment."

59. The Report also reflected that several employees interviewed statements of excessive workload that bring stress to employees, sleep fellows and past sleep fellows.

60. A review of the Report shows, nine (9) employees were interviewed, including Vargas-Perez and Dr. Jimenez. Six (6) out of the seven (7) additional employees interviewed made statements against Dr. Jiménez and the Sleep Service Environment. Only one (1) out of the seven employees interviewed supported Dr. Jimenez. Despite the evidence uncovered during this investigation, the defendant did not take corrective actions directed to improve the terms and conditions of plaintiff's and other employees' employment under the supervision of Dr. Jimenez.

61. On September 8, 2022, Vargas-Perez notified Dr. Jimenez and other members of management about that day's overbooking of patients while having available him as the only

physician available attend to the patients while, in addition, several patients were scheduled for appointments at the same time.

62. On September 9, 2022, Vargas forwarded an email to Dr. Maricarmen Cruz, Chief of Staff of Education - responsible for overseeing fellows and residents educational and residency training programs – notifying her about his concerns regarding the lack of supervision of sleep fellows.

63. On that same day, Dr. Toro, Dr. Maricarmen Cruz and other members of management and staff met and decided to subject Vargas-Perez to a Focus Provider Practice Evaluation [FPPE], a process directed to assess Vargas' professional privileges and competency in performing competently his medical privileges at Veterans Administration Hospital and his ability to provide safe, high quality patient care, among others and to remove Vargas-Perez as a member of faculty for the fellows that provided services at the Sleep Clinic.

64. Defendants' decision to place Vargas on a FPPE after he denounced the risky medical practices at the Sleep Clinic, constitutes a veiled but unjustified disciplinary process and retaliation for his exercise of his constitutional rights under the First Amendment of the Constitution of the United States.

65. On September 23, 2022, Dr. Doris Toro, Dr. Jimenez's direct supervisor, placed Vargas-Perez under a "Focus Professional Practice Evaluation" (FPPE). She charged Vargas-Perez with "unprofessionalism" and "interpersonal and communications skills."

66. In support of the FPPE, Dr. Toro made reference to alleged evidence of other employees that had complained about Vargas-Perez.

67. Vargas-Perez, through the AFGE, requested the V.A. management to produce such evidence for his review and consideration. The V.A. management never responded to the AFGE request.

68. Dr. Toro never met with Vargas-Perez after notifying her decision nor provided any follow-up to the FPPE. It was never mentioned again.

69. In further retaliation, for the Proficiency Report of 2022, Dr. Jimenez blatantly regarded his work performance as "Unsatisfactory," the lowest possible level.

70. Pursuant to the Master Collective Bargaining Agreement between the defendant and the AFGE, an employee may only be considered for position promotion if his performance evaluations do not reflect a lesser rating that "Fully Satisfactory." Thus, defendant's unjustified and retaliatory performance evaluation further ensured that the door for Vargas-Perez's position promotions were closed shut.

71. The underlying basis of Dr. Jimenez's charges against Vargas-Perez were matters that were of personal and individual interest and nature to Dr. Jimenez. She charged that Vargas-Perez made comments about her "not remembering" matters he asserts he had communicated to her and that he made reference to the "green book" where she made notations. No reference was made to the quality of this work and/or the manner in which he performed his duties as neurologist and provided medical services to the veteran population at the V.A.

72. Faced with defendant's failure to respond or take any actions to resolve the matters repeatedly denounced, Vargas-Perez sought the intervention and review of his concerns by an objective body of professionals. Thus, on December 21, 2022, Vargas-Perez reached out to the Office of The Medical Inspector (OMI) to express his concerns about workload increase, poor clinic slot management and coordination, poor communication with supervisor and staffing issues that destabilized the clinic and its services.

73. On January 31 and February 3, 2023, the OMI conducted its investigation on the following matters: whistleblower alleged conduct in the Sleep Medicine Service that may constitute a

violation of law, rule or regulations; gross mismanagement; gross waste of funds; abuse of authority; or substantial or specific danger to public safety.

74. The OMI reviewed Plaintiff's allegations and determined the merits of each, and the National Center in Ethics in Health Care had provided a health care ethics review. The OMI concluded that San Juans' care demands for sleep medicine exceed their resources and despite their efforts, Veteran access and staff morale have been negatively impacted.

75. The OMI Investigation concluded that:

    a. "an increase in [sleep medicine] workload accentuated poor clinic scheduling management and coordination negatively impacted Veteran access;

    b. The Sleep Medicine service has had an increase in workload from fiscal year 2019-January 2023 and their clinic scheduling management and coordination has negatively impacted Veteran access;

    c. Sleep Medicine's 50% vacancy rate has resulted in an insufficient amount of providers and technicians and has negatively contributed to in-clinic and scheduling wait times;

    d. It appears that San Juan Sleep Medicine leadership is not using all available resources (a former Sleep Medicine physician and technician offered to assist) to help address the longer-than-acceptable wait times and delayed patient access;

    e. The clinic profile data is inconsistent with the current number of approved Full Time Employee Equivalents; it is unclear San Juan can accurately assess their available staffing or accurately plan for their staffing human resources needs;

    f. San Juan's current operational model is not sufficient to meet their demands and is negatively contributing to productivity, staff burnout and access challenges;

      g.      Considering that San Juan's current staff demand versus supply, staff members have valid concerns about adverse patient outcomes if patients are not seen and treated for their sleep disorders in a timely manner;

      h.      70% of the current and former staff of the Sleep Medicine Service … expressed complaints about the way [Dr. Jimenez] communicated and how that communication impacted the environment;

      i.      there is no clear effort to employ a servant-leadership model to improve morale and confidence in the neurology/sleep medicine management;

      j.      Since [Dr. Jimemez] removed the responsibilities of teaching the fellows from one attending [Dr. Vargas-Perez], there is primarily one attending available for the two fellows during clinic. As a result, on one occasion, one fellow and the involved patient had to wait 45 minutes before the patient findings could be presented to the attending. This can be better stated.

76.      In April 2023, an administrative investigation (AIB-23-1) was initiated regarding Vargas-Perez's claims of retaliation, harassment and hostile work environment, and whether Dr. Jimenez "undermined the culture of safety by assigning an excessive and/or inequitable workload distribution to Vargas-Perez either by Clinic workload assignment and/or Sleep Medicine Fellows Supervisory duties."

77.      On May 2, 2023, Dr. Jimenez was notified that she was the subject of the administrative investigation.

78.      On July 23, 2023, the OMI rendered the investigative report referred to in paragraphs 72-75 of this Complaint, with the above-stated conclusions and findings.

79.      On August 1, 2023, Carlos R. Escobar, notified that, pursuant to the administrative investigation AIB23-1, Dr. Jimenez was exonerated and reinstated to her duties.

80. On August 17, 2023, that is, within two weeks of the investigation, and three weeks from the OMI's Investigative Report, Carlos R. Escobar – Executive Director - notified Vargas-Perez that he was discharged from employment effective August 25, 2023.

81. According to the defendant, the discharge was due to Vargas-Perez's alleged "inappropriate conduct."

82. No further explanation was provided defining the alleged "inappropriate conduct" for which Vargas-Perez was terminated from his employment.

83. The defendant never provided Vargas-Perez with the evidence of the alleged "inappropriate conduct" was provided.

84. The defendant did not provide Vargas any advanced written notice of its intention to subject Vargas to a disciplinary or dismissal action.

85. The defendant did not provide any notice of the law or regulation under which defendant's intended to place subject Vargas to a proposed disciplinary nor dismissal action.

86. The defendant failed to clearly specify the charges or provide information regarding the basis of the intended disciplinary or dismissal action.

87. The defendant did not provide Vargas notice or information on how he could obtain copy of (or access to) the evidence in which the defendant based its intention to subject Vargas to disciplinary or dismissal actions.

88. The defendant failed to provide Vargas his right to respond to its intention to subject him to disciplinary or dismissal actions.

89. The defendant did not provide Vargas-Perez with advance or prior notice of its intention to dismiss him from employment.

90. No hearing prior to Vargas-Perez's deprivation of employment was held.

91. The defendant did not provide Vargas-Perez with notice of his appeal rights.

92. In the letter of dismissal, the defendant misrepresented that Vargas-Perez had been hired pursuant to 38 U.S.C. 7405(A)(1), a statutory provision that applies only to employees hired in a temporary basis. Thus, the defendant intentionally misguided Vargas-Perez about the realm of due process rights and guarantees that he was entitled to as *permanent* federal employee.

93. Defendants violated Vargas-Perez's right to due process under the Fifth Amendment of the Constitution of the United States.

94. Defendants violated Vargas-Perez's right to free speech pursuant to the First Amendment of the Constitution of the United States.

95. Defendants have tainted Vargas-Perez's professional reputation and development in violation of his liberty rights under the Fifth Amendment of the Constitution of the United States.

96. As a direct result of defendants' actions and omissions, Vargas-Perez has lost and will continue to lose 35% of his source of income for himself and his family, the loss of the retention bonus of approximately fifteen (15) thousand dollars, the end-of-the-year performance bonus of up to approximately sixteen (16) thousand dollars, the opportunity to be promoted to higher " steps" within his position and the commensurate increase in salary, the loss of access to the Thrift Savings Plan and the opportunity to timely, adequately plan for and fund his retirement, a concrete financial benefit granted to all federal employees.

97. As a direct result of defendants' actions and omissions, Vargas-Perez has suffered and continues to suffer emotional damages, anxiety, loss of sleep, nervousness which has required the treatment of specialized professionals.

98. As a direct result of defendants' actions and omissions, Vargas-Perez has and will continue to suffer irreparable injuries to his professional reputation, to his professional development and

continued training as a neurologist and educator, damages are not subject to monetary measurement or compensation and that monetary relief provided at a later time will not adequately compensate.

## CAUSES OF ACTION

### First Cause of Action

99. Plaintiff hereby incorporates by reference each and every allegation asserted in paragraphs 1 to 98 of the Complaint as though set forth fully herein.

100. Defendants are liable for the violation of Vargas-Perez's right to free speech pursuant to the First Amendment of the Constitution of the United States.

101. Defendants are liable for compensatory in an amount of no less than $ 2,5000,000.

102. Defendant is liable for back pay.

### Second Cause of Action

103. Plaintiff hereby incorporates by reference each and every allegation asserted in paragraphs 1 to 102 of the Complaint as though set forth fully herein.

104. Defendants are liable for the violation of Vargas-Perez's right to due process pursuant the Fifth Amendment of the United States.

105. Defendants are liable for compensatory in an amount of no less than $ 2,500,000.

106. Defendant is liable for back pay.

### Third Cause of Action

107. Plaintiff hereby incorporates by reference each and every allegation asserted in paragraphs 1 to 106 of the Complaint as though set forth fully herein.

108. Defendants are liable for the violation of Vargas-Perez's liberty right to be free from a tarnished professional reputation and to his professional development as neurologist and educator under the Fifth Amendment of the Constitution of the United States.

109. Vargas-Perez's injury to his reputation is irreparable by monetary compensation. Should a compensatory amount be required, Defendants are liable for compensatory in an amount of no less than $ 2,500,000.

110. Defendant is liable for back pay.

### Fourth Cause of Action
### (Declaratory Judgment)

111. Plaintiff hereby incorporates by reference each and every allegation asserted in paragraphs 1 to 110 of the Complaint as though set forth fully herein.

112. The facts in this case support the allegations of serious statutory and constitutional violations perpetrated against Vargas-Perez, including but not limited to the deprivation of property without due process of law.

113. The facts in this case show that the Defendant ordered Vargas-Perez's dismissal while violating essential procedural and substantive rights owed by the Government to a permanent federal employee.

114. Due exclusively to Defendant's intentional failure to follow mandated due notice procedural requirements, Vargas-Perez's rights to respond to charges, to examine the evidence defendant relied upon, challenge defendant's factual premises and exercise his rights to appeal were foreclosed.

115. Vargas-Perez is entitled to a declaration that he had the right to prior notice:

   a.   of defendant's intention to dismiss him from employment;

    b.    the laws and regulations allegedly violated that sustained the intended dismissal;

    c.    and access to the evidence in support of its intention of dismissal;

    d.    of his right to respond to defendant's charges in support of dismissal;

    d.    his right to appeal and all information necessary for his proper exercise of that right.

116. Declare that Defendant's failure to take these material steps not in accordance with the law violated Vargas-Perez's right to due process.

117. This Court should hold defendant's actions as unlawful, set aside the dismissal and compel defendant to reinstate Vargas-Perez to his previous employment position with all the privileges and benefits ascribed to his position.

## RELIEF

WHEREFORE, Dr. Noel Vargas-Perez prays the Court:

1. Declare that the Defendant did not provide him with due notice as required by law;

2. Declare that Defendant violated the due process rights guaranteed to all permanent federal employees;

3. Grant an injunction and order defendant to immediately reinstate Dr. Vargas-Perez to his position as neurologist at the V.A. Sleep Medical Clinic and restore each of the duties previously assigned to his position;

4. Order the immediate reinstatement of Vargas-Perez's employment position and order payment of back pay and all monetary incentives owed;

5. Order defendant expunge from Vargas-Perez's personnel record each and every document that reflect Defendant's statement about his alleged but "inappropriate conduct."

6. Order Defendant to refrain from referring to Vargas-Perez as an employee that engaged in "inappropriate conduct."

7. Find that the Defendant violated Vargas-Perez's Fifth Amendment right to due process;

8. Find that the Defendant violated Vargas-Perez's First Amendment right to free speech;

9. Find that the Defendant violated Vargas-Perez's Fifth Amendment liberty and property rights;

10. Award Vargas-Perez compensatory damages for an amount of no less than $7,500,000;

11. Award Vargas-Perez back pay;

12. Award Vargas-Perez the cost of this litigation and attorneys' fees;

13. Award Vargas-Perez pre-judgment interest;

14. Grant Vargas-Perez such other and further relief as the Court may deem just and proper.

**A jury trial is hereby requested.**

**Respectfully Submitted.**

**In San Juan, Puerto Rico, this 4th day of June 2024.**

*S/Maricarmen Almodóvar-Díaz*
**MARICARMEN ALMODÓVAR DÍAZ**
U.S.D.C.P.R. No.: 204406
P.O. Box 363871
San Juan, P.R. 00936-3871
Email: malmodovarlaw@gmail.com
Tel. 787-233-3306